UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE/INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: **Cline Grain, Inc.,** Debtor | Case No: 17-80004-JJG–11 |
| In re: **Cline Transport, Inc.,** Debtor | Case No: 17-80005-JJG–11 |
| In re: **New Winchester Properties, LLC,** Debtor | Case No: 17-80006-JJG–11 |
| In re: **Allen L. Cline,** **Teresa A. Cline** Debtor | Case No: 17-00014-JJG–11 |
| In re: **Michael B. Cline,** **Kimberly A. Cline** Debtor | Case No: 17-00013-JJG–11 |

## Motion For Joint Administration

The above-captioned debtors-in-possession (individually, "Debtor" and collectively, "Debtors") hereby respectfully move the Court for entry of an order directing joint

1

administration of their respective chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule B-1015-1. In support of this motion, the Debtors respectfully state as follows:

**I. Background**

1. The Debtors filed their respective petitions for relief under Title 11, Chapter 11 of the United States Code on January 3, 2017 (the "Petition Date"). The Debtors have continued after the Petition Date in the possession of their property and the management of their business as Debtors-in-Possession pursuant to 11 U.S.C. §1107 and 1108.

2. This Court has jurisdiction over this Motion and this matter pursuant to 28 U.S.C. §157(b).

3. Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. No trustee or examiner has been appointed in these chapter 11 cases, and no committees have been appointed or designated.

5. The cases of Allen and Terri Cline and Mike and Kim Cline would be Chapter 12 family farms cases; however, the amount of their debt exceeds the jurisdictional limit contained in 11 U.S.C. §109(f) and 101(18) thus necessitating these cases being filed under Chapter 11.

6. The cases of Allen and Terri Cline and Mike and Kim Cline are reorganizations and the cases of Cline Grain, Inc., Cline Transport, Inc. and New Winchester, LLC are liquidations.

   *A. Family Farm Background*

7. Allen Cline and Mike Cline are eighth generation family farmers, d/b/a "Cline Farms" in Putnam, Montgomery, Hendricks and Fountain Counties. Cline Farms owns approximately 1600 acres today, down from a recent 2200 acres of farm ground. Cline Farms is primarily a row-crop operation of corn and soybeans. The entire farm—with rented ground—is around 6,500 total acres. The Clines are the largest landowners in Putnam County.

8. In 2015, Mike Cline had $1,916,733 and Allen Cline had $2,007,100 in gross income from farming operations ($3,923,833 total) as reported on their tax returns.

9. For reasons related to the failure of the Grain buying business (as will be discussed below), Allen and Mike Cline did not farm in 2016 and will not farm in 2017; instead, their grown sons farmed the Cline Farm lands and rented acres and secured their own input loans, crop insurance and in return paid cash rent to the Clines for use of the land and a rental price for use of the farming equipment owned by Mike and Allen Cline. That arrangement will continue for the 2017 crop year and beyond during the anticipated life of a plan or plans submitted in these cases.

Because the Clines only cash rent their land, the crops on that land belong to their sons, and not them. Their sons' lenders have crop liens on those crops, which are not property of any of these estates.

10. With respect to the owned farmland, it is owned in a variety of forms: Allen and Terri Cline; Mike and Kim Cline; Mike and Allen Cline; and Patricia Cline (the mother of Allen and Mike). Metropolitan Life Insurance Company ("Metlife") has a first mortgage lien on all nearly all the real estate owned by the Clines. Wells Fargo has a second mortgage lien on the same real estate. The Clines are also buying over 400 acres of farmland on contract.

11. Upon information and belief and recent sales in Putnam and Montgomery Counties (including sales of Cline farmland), both MetLife and Wells Fargo are significantly over-secured. According to the schedules filed in the Cline cases, MetLife is owed $5,501,611.27 and Wells Fargo is owed $2,413,721.17. The value of the MetLife collateral is $11,823,500.00 and value of the Wells Fargo collateral is $15,483,000.00 (Wells Fargo has collateral from additional borrowers that MetLife does not have).

12. Accordingly, it is not anticipated that adequate protection would need to be provided to either MetLife or Wells Fargo in the form of periodic payments to reduce principal, interest or expenses during the course of the case because of a lack of diminishment of their collateral and the substantial equity cushion. Debtors have no reason to believe that equity cushion will change during the course of these cases, from which the Debtors hope to emerge by the summer of 2017.

13. It is not anticipated that use of cash collateral will be an issue for quite some time in this case, if at all. The only cash collateral in the case is anticipated to be the lease and rental payments received by Mike and Allen Cline from their sons, which will likely not be until the fall. The Clines do not anticipate the need to ask the Court for use of cash collateral until that point, assuming the case is not before then confirmed.

14. Prior to the filing of these cases, the Clines had been largely current on all debt obligations; in fact, the defaults under loan agreements with MetLife and Wells Fargo were not payment defaults. Real property taxes, equipment payments, prior year input costs, and land sale contracts were all largely current. The failure of Cline Grain in 2016 and difficulties with Wells Fargo have, however, had an effect that has lead to this filing.

### B. Grain Buying Background (Cline Grain, Inc.; Cline Transport, Inc. and New Winchester, LLC)

15. Farming has been the primary family business when the Clines decided to expand in grain buying in 2004 with the incorporation of Cline Grain, Inc., which purchased from Cargill a grain elevator. Cline Grain expanded in 2011 and 2012 when it added new locations in Scott's Prairie, Kingman, New Market and Ladoga.

Cline Grain invested in grain bins over the years adding about $2,100,000 in new value.

16. Until closing operations, Cline Grain offered full service chemical, fertilizer and application services in addition to grain buying from grain producers. In a typical transaction, Cline Grain would buy grain from a producer at a fixed price or a price to be fixed in the future. Cline Grain had access to futures to hedge against price fluctuations. Cline Grain would then turn around and sell to a bulk buyer, such as the ethanol plants in the midwest or a large buyer, like Cargill. To give an idea of the size of the grain buying operations, in 2015 Cline Grain had gross sales of $46,940,295.

17. Grain elevators in Indiana have to be licensed and bonded. The Indiana Grain Buyers and Warehouse Licensing Agency (the "IGBWLA") oversees a grain buyer's license, which Cline Grain had, in addition to a $250,000 bond.

18. The Cline Grain elevators are located on property that is owned by New Winchester Properties, LLC. Allen and Mike are the managing members of New Winchester. Mike, Allen, Terri and Kim are 25% owners of Cline Grain, Inc. There are multiple mortgages on the New Winchester Properties real estate: on the Danville Property, Tri-County Bank has the first lien, Pinnacle Agriculture Distribution Inc. has a second lien and Logansport Savings Bank has a lease for some equipment including a truck scale; on the Hillsboro property, Wells Fargo has a first lien, Pinnacle has a second and First Farmers Bank & Trust has a lease for various equipment and a junior mortgage; and on the Kingman Property, Pinnacle has the first lien; finally, on the Ladoga Property, Wells Fargo has the first lien and Pinnacle has a junior mortgage.

19. Cline Transport, Inc. is a corporation wholly owned by the Clines which operates in support of the elevator and farms. Cline Transport owns semi-tractors that provide hauling. Cline Transport also functioned as the employee-leasing unit in the grain buying operation. All employees were in fact employees of Cline Transport.

### C. *Cline Grain, Inc. Difficulties*

20. From 2012 to its close in 2016, various events cause the eventual failure of the grain elevators. In the fall of 2012 there was a drought in West Central Indiana. The Cline elevators were only profitable if they could fill up in the fall and take advantage of the basis improvement that occurs throughout the year. In 2012, the elevators were not able to get full. Also, the 2012 crop had a disease called Aflatoxin, which lead to extra storage, management and trucking costs.

21. In the fall of 2013, the Clines used a ground pile system. There was a ground pile at Scott's Prairie with about one million bushels of corn. The goal was to pick up the pile quickly. Due to many factors, Clines were unable to get the pile picked up as quickly as had been anticipated. There was terrible weather that winter that

made it impossible to pick up the pile or even truck corn. The Clines were eventually able to get the damage from the pile blended out, but it took time and labor and it wasn't efficient.

22.  In 2014 Clines bought more corn than could be physically delivered in time to pay farmers.

23.   The 2015 growing season brought 100-year floods. This caused Cline to not be able to fill the elevators in the fall. The lack of full elevators hurt Clines profitability.

24.  The IGBWLA audited Cline Grain about every 3 months that year. In July, Cline Grain needed its warehouse receipts back from Wells Fargo to pass the audit. Wells Fargo would not relinquish the warehouse receipts. In August of 2015 Cline Grain had a hearing with IGBWLA and Wells Fargo. Wells eventually gave Cline Grain the warehouse receipts back because the Clines received a farm operating loan from Hoosier Heartland State Bank ("HHSB") to pay $1 million to Wells Fargo immediately with an agreement to pay the remaining balance at harvest. The Clines borrowed $1 million from HHSB for 1 month. Clines paid Wells Fargo the balance at the same time they paid off HHSB. Once Wells Fargo was paid, Clines got the warehouse receipts back from Wells Fargo and was able to pass the audit.

25. The IGBWLA told Cline Grain that it was on an accelerated auditing program and that they would come soon. They audited in December 2015 and Cline Grain passed. In March of 2016, the IGBWLA conducted another audit. This time the IGBWLA found a shortfall of grain. The IGBWLA knew Clines were working on financing, so they gave Clines a few days to see if anything could be finalized. On April 8th Clines told the IGBWLA that they didn't have any reason to believe that they were going to be able to find financing fast enough and thought it was best to surrender its license.

26.  Once Cline Grain surrendered the grain license to the IGBWLA, the Clines started working on finding a buyer for the elevators. The Clines personally were unable to farm in 2016 because Wells would not release the crop liens that they had from 2015. Their sons were able to find financing and paid Clines' machinery and land rent to cover expenses for 2016.

27.  Once their license was surrendered to the IGBWLA, the IGBWLA started a process pursuant to I.C. § 26-3-7-16.5 to determine if there was a shortage in grain and grain proceeds from which to compensate any producer than remained unpaid at the time of the license return. A public hearing was held to determine claimants' shortage amounts. A finding was entered by IGBWLA on August 8, 2016 with the assistance of the Indiana Attorney General's Office. Numerous claimants were identified with the help of Cline Grain records and shortage amounts were established.

28. Farmers in Indiana may participate in insurance to hedge against the failure of a grain buyer, called the Grain Indemnity Program, I.C § 26-4. If someone participated in the Grain Indemnity Fund, and there was a grain buyer failure, the fund would indemnify the qualified producer 80% of any loss, with a statutory mechanism to determine the correct grain pricing (a few producers will receive 100% of their claims, depending on if they meet certain statutory criteria).

29. On information and belief, the IGBWLA, after dealing with a few appeals of the August 8, 2016, findings, will begin making payments to producers that lost money as a result of the Cline Grain closure. It is further believed that IGBWLA may seek claim subrogation against Cline Cline from any producer than receives an indemnity payment. The Clines have tried their upmost to cooperate with IGBWLA to allow this process to proceed as smoothly as possible so that producers may receive their money as quickly as possible. Cline Grain has provided all documentation requested in order to facilitate the IGBWLA's review.

30. At this time, because the State of Indiana Grain Indemnity Fund process is well underway to compensate producers and large reduction in claimants as a result of the subrogation, Cline Grain does anticipate seeking to interrupt the IGBWLA process in any way by the filing of these cases. In this rare instance, the State statutory claims review and indemnity process is far better than any process that could be initiated under Federal Bankruptcy laws.

### C. *Wells Fargo*

31. The Clines started the elevator business in 2004. In 2008 they started banking with Wells Fargo. There were elevator operating notes in 2008/2009 and 2009/2010. They were able to operate without an elevator operating note after that. During harvest of 2014 it became obvious that Clines were going to need an operating note. They talked to Wells Fargo because they had loaned them money to build bins in 2013 and 2014. They were also loaning operating money to farm. The Clines thought they would be a good candidate for elevator operating money; however, Wells Fargo was not interested in loaning money to operate the elevators.

32. The Clines didn't realize it, but the SBA loan documents that were signed with Wells Fargo, did not allow them to grant a junior lien on the property without Wells' consent. Shortly after they finalized the paperwork for the SBA loan with Wells Fargo (April 2015), they got a call telling them that there was a problem because of First Farmers lien on the property.

33. In a further effort to reduce the overall indebtedness, and at the direction of Wells Fargo, an auction was conducted on the elevators in the fall of 2016. Unfortunately, the required minimum bids for the facilities were not received so the auction was not successful.

34. In 2016 and just prior to this bankruptcy, the Clines sold various parcels of their personal real property in order to reduce the indebtedness to MetLife and Wells

Fargo. The total paid to those lenders in the last few months was approximately $3,486,477.17 and substantially reduced the overall indebtedness. Nevertheless, neither MetLife nor Wells Fargo would retract their alleged default.

**II.  Requested Relief**

35.  The Debtors hereby seek the joint administration of their above-captioned cases. The Debtors further seek Cline Grain, Inc.—which has the lowest cause number—be the "lead case" and that the caption of their chapter 11 cases be modified to reflect the joint administration of the chapter 11 cases as follows:

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| In re:<br><br>**Cline Grain, Inc.,**<br>**Allen L. Cline & Teresa A. Cline,**<br>**Michael B. Cline & Kimberly A. Cline**<br><br>Debtors | Case No: 17-80004-JJG–11<br>JOINTLY ADMINISTERED |

**III.  Basis for Requested Relief**

36.  Rule 1015(b) of the Bankruptcy Rules provides that if two or more petitions are pending in the same court by a debtor and an affiliate, the court may order a joint administration of the estates upon due consideration of protecting creditors of different estates against potential conflicts of interest.

37.  The term "affiliate" is defined in the Code at §101(2). Its relevant sections are as follows:

> (2) The term "affiliate" means--
>
> (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--
>
> . . .
>
> (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to

7

vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--

. . .

11 U.S.C §101(2).

38. If any or all of Cline Grain, Inc. ("Cline Grain"), Cline Transport, Inc. ("Cline Transport") or New Winchester Properties, LLC ("New Winchester") (the forgoing are the "Cline Corporations") are the "debtors" in the definition of "affiliate", then subsection (A) is applicable for joint administration (two or more petitions are pending in the same court by a *debtor* and an *affiliate*) with Allen L. Cline, Teresa A. Cline, Michael B. Cline and Kimberly A. Cline (the "Cline Individuals") because the Cline Individuals own all the shares of the Cline Corporations. Cline Individuals are *affiliates* of Cline Corporations.

39. The reverse is an additional statutory fit for joint administration: if any or all of the Cline Individuals are the "debtors" within the definition of "affiliate", then subsection (B) is applicable for joint administration (two or more petitions are pending in the same court by a *debtor* and an *affiliate*) with the Cline Corporations because the shares of the Cline Corporations are all owned by the Cline Individuals. Cline Corporations are *affiliates* of Cline Individuals.

40. In summary, Rule 1015(b) requires, at a minimum: (i) that there must be pending in the same Court all debtors to jointly administer (all the cases are currently pending in the Southern District of Indiana, Indianapolis Division—which is the proper Federal District and proper division within that district); and (ii) the cases to be jointly administered must be between a debtor and an affiliate (as shown above, Cline Corporations are *affiliates* of Cline Individuals and Cline Individuals are *affiliate* of Cline Corporations).

41. The Cline Corporations and Cline Individuals have a large overlap of debt between them. MetLife is owed $5,501,611.27 and has first mortgages on the land owned by all the Cline Individuals. Wells Fargo is owed $2,413,721.17 and has a second mortgage behind MetLife on exactly the same land owned by the Cline Individuals. Wells Fargo also has a first lien on property owned by Cline Grain and New Winchester. The Internal Revenue Service is owed for certain 943 withholding taxes from Cline Transport in the approximate amount of $982,000, and Cline Individual debtors, Allen and Terri Cline, have been personally assessed a trust fund penalty for a portion of that amount.

42. The Cline Corporations are all expected to fully liquidate as part of these cases in support of reorganization of the Cline Individuals, who are only expected to maintain a business of renting farmland to tenants and farm equipment to those same tenants.

43. It is submitted that joint administration of the respective bankruptcy cases will provide a level comfort to the Court, the US Trustee, any committee appointed, Debtors and the creditors that everyone is seeing the "entire picture" of the economic life of all the Debtors and all their debts and assets in one place at one time.

44. Conversely, *not* jointly administrating the cases of the Debtors would be awkward, difficult, expensive—for the Debtors, yes, but also for the creditors with claims in multiple estates. Awkward because many of the same issues will come up in each estate (adequate protection, cash use, contract assumption, claims allowance, plan acceptance or denial) and administration in different cases or different Courts presents the possibility of inconsistent rulings. Difficult because it will be hard for all parties to keep track of all the cases and how they might eventually fit together; difficult because there would be five sets of deadlines instead of one, five 341 meetings, five UST Trustees, five potential committees, duplicative pleadings in multiple cases—surely creative minds can think of even more issues. Expensive is perhaps the most obvious—for the Debtors as well as for the creditors. Many pleadings and hearings on such pleadings will have to be duplicated and have to be conducted multiple times. It won't take much of that activity to exhaust legal budgets on all sides in a case this size.

45. In order to administer the five pending chapter 11 cases optimally and economically, such cases should be jointly administered—for procedural purposes only—under the case number assigned to Cline Grain. Many of the notices, motions, hearings and orders that will arise in the Debtors' chapter 11 cases will jointly affect all Debtors. By jointly administering the Debtors' chapter 11 cases, the Debtors will be able to reduce fees and costs resulting from the administration of these cases and ease the administrative burden of having to file multiple documents.

46. The rights of the Debtors' respective creditors will not be adversely affected by virtue of the joint administration of the Debtors' cases. The relief sought herein is solely administrative and is not intended to affect substantive rights. Indeed, the Debtors' creditors will benefit from the reduced costs and avoidance of duplicative and potentially confusing filings as a result of such joint administration. Further, joint administration will protect parties in interest by ensuring that parties in each of the Debtors' respective cases will be apprised of the various matters before this Court in all those cases.

47. The creditors will not be prejudiced by any conflicts of interest resulting from the joint administration of the Debtors' cases. At this point, no actual conflicts of interest have been identified. There may be transfers between the Cline individuals and entities. There were transfers noted on the 2015 tax returns as of December 31, 2015. Because the books are not yet closed for 2016, the Clines are unable to determine if any transfers were still outstanding as of the petition date.

48. Cline Grain, Inc., Cline Transport, Inc. and New Winchester LLC operated as one economic unit—the grain elevators. The Cline individuals operated as one

economic unit—Cline Farms. It would be incredible indeed if there were not transfers within and even among the economic units. If, later in the case a conflict is identified, perhaps appointment of special counsel or a similar arrangement can rectify any conflict as between the estates. The benefits of joint administration vastly outweigh the difficulty one or more actual conflicts may present.

49.  This Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. The relief sought herein is commonly granted in this District.  See, e.g., *In re Amcast Automotive of Indiana, Inc. and Amcast Industrial Corp.*, Case No. 05-33322-FJO-11 Jointly Administered; *In re Pain Management Center of Southern Indiana, P.C., Pain Management & Surgery Center of Southern Indiana, Inc., Comprehensive Spine Care, P.C.*, Case No. 08-10555-AJM-11 Jointly Administered; and *In re Buehler Foods, Inc., et al.*, Case No. 05-70961-BHL-11 Jointly Administered.

50.  Finally, the Debtors request entry of an order that tracks Local Rule B-1015-1(b), with the possible exception that Debtors may seek permission by further motion to this court to file one disclosure statement and plan for the ease of all parties and simplicity. It is too early to make that determination, so the Debtors request that with respect to documents filed separately under Local Rule B-1015-1(b)(5)(B) and (6) the Court make no ruling at this time, subject to the requirement that the Debtors file a pleading in respect of the plans and ballots at a further, appropriate time in this matter.

### Request For Relief

The Debtors respectfully request that this Court grant all just and proper relief in the premises on this Motion, including granting joint administration of the cases.

Respectfully submitted,

HESTER BAKER KREBS, LLC


*/s/ Jeffrey M. Hester*
Jeffrey M. Hester
Christopher E. Baker
John J. Allman
Suite 1600
One Indiana Square
Indianapolis, IN 46204
jhester@hbkfirm.com
317.608.1129 direct
317.833.3031 fax

**Certificate Of Service**

I hereby certify that on January 4, 2017, a copy of the foregoing *Motion for Joint Administration* was filed electronically. Notice of this filing will be sent to the parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

I hereby certify that on January 4, 2017, a copy of the foregoing *Motion for Joint Administration* was served on the Debtors, Debtors' attorney, US Trustee and all parties in interest (either through the Court's Electronic Case Filing System or per service below).

In addition to service through the Court's Electronic Case Filing System, Debtors' counsel will also serve this as a first day motion pursuant to Local Rule B-9013-3(d) and file a Certificate of Mailing as a separate entry.

*/s/ Jeffrey M. Hester*
Jeffrey M. Hester